IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BLUEFIELD DIVISION

| | | |
|---|---|---|
| **CLIFFORD H. WILEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO. 1:07-00327** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security denying Plaintiff's application for Supplemental Security Income (SSI), under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. This case is presently pending before the Court on the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 11 and 13.) Both parties have consented in writing to a decision by the United States Magistrate Judge. (Document Nos. 2 and 6.)

The Plaintiff, Clifford H. Wiley (hereinafter referred to as "Claimant"), filed an application for SSI on February 15, 2005 (protective filing date), alleging disability as of September 12, 2004, due to past drug and alcohol abuse, hepatitis B and C, and arthritis.[1] (Tr. at 18, 56, 57-59, 65.) The claim was denied initially and upon reconsideration. (Tr. at 29-31, 36-38.) On January 11, 2006, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 42.) The hearing was held on August 3, 2006, before the Honorable Steven A. De Monbreum. (Tr. at 238-300.) By

---

[1] The decision regarding Claimant's request for reconsideration indicates that Claimant alleged on appeal, the additional disabling impairment of depression. (Tr. at 36.) However, the Court notes that depression is not identified specifically in his form Disability Report - Appeal. (Tr. at 77, 110.) Rather, Claimant reported on January 24, 2006, that he lost control, was not able to walk, and lost his memory. (Tr. at 77.) He further reported on an undated form that he required a liver transplant and had "passing out spells." (Tr. at 110.)

decision dated October 25, 2006, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 18-26.) The ALJ's decision became the final decision of the Commissioner on March 22, 2007, when the Appeals Council denied Claimant's request for review. (Tr. at 5-8.) On May 21, 2007, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2006). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether

2

the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2006). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of

>the Listings of Impairments.
>(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date. (Tr. at 20, Finding No. 1.) Under the second inquiry, the ALJ found that Claimant suffered from hepatitis B and C, a back disorder, a history of shoulder injury that required three surgeries, and a history of poly-substance abuse/dependence, which were severe impairments. (Tr. at 20, Finding No. 2.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 23, Finding No. 3.) The ALJ then found that Claimant had a residual functional capacity for work at the light level of exertion, as follows:

> [C]laimant retains the residual functional capacity to lift and/or carry up to 20 pounds occasionally and up to 10 pounds frequently. He should avoid activities that require more than occasional climbing, balancing, stooping, and crawling. He would also have only occasional use of his left (non-dominate) upper extremity. He should also avoid concentrated exposure to extreme cold and heat, vibratory tools, and hazards.

(Tr. at 23, Finding No. 4.) At step four, the ALJ found that Claimant could not return to his past relevant work. (Tr. at 24, Finding No. 5.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded at step five that Claimant could perform jobs such as a watch guard, laundry worker, and domestic cleaner, at the light level of exertion. (Tr. at 25,

Finding No. 9.) On this basis, benefits were denied. (Tr. at 26, Finding No. 10.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on August 26, 1961, and was 44 years old at the time of the administrative hearing, August 3, 2006. (Tr. at 25, 57, 244.) Claimant had an eighth grade education and a Generalized Equivalency Diploma. (Tr. at 25, 245.) In the past, he worked as a tractor trailer driver, box truck driver, and timberer. (Tr. at 66-67, 71-76, 247-49, 290.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in two respects in assessing Claimant's residual functional capacity ("RFC"). (Document No. 12 at 4-13.) First, the ALJ erred in disregarding the signs and symptoms of Claimant's hepatitis B and C that were identified by Claimant's treating source, Dr. Patel. (Id. at 4-8.) Second, Claimant alleges that the ALJ erred in assessing his credibility. (Id. at 8-10.) Claimant further alleges that the ALJ erred in failing to include Claimant's nonexertional limitations, namely chronic fatigue, dizzy spells, nausea/vomiting, muscle and joint aches, abdominal pain, weakness, hot and cold spells, loss of appetite, sleep disturbance, and weight loss, in the hypothetical questions presented to the vocational expert. (Id. at 4-5.)

The Commissioner asserts that Claimant essentially alleges that because he was diagnosed with hepatitis, the ALJ was required to accept fully his extreme subjective assertions of limitation. (Document No. 13 at 5.) The mere diagnosis alone however, the Commissioner asserts is insufficient to establish disability. (Id. at 7.) Rather, the Commissioner points out that the burden of establishing disability, at least at the first four steps of the sequential analysis, remains with the Claimant. (Id. at 6-7.) To this end, the Commissioner asserts that despite Claimant's assertion to the contrary, he cannot point to a single medical source opinion documenting functional limitations beyond those found by the ALJ. (Id. at 6.) Regarding the ALJ's credibility finding, the Commissioner asserts that the record contains compelling evidence of a lack of credibility as there are several inconsistencies in Claimant's statements. (Id. at 8.) Furthermore, the Commissioner asserts that neither Claimant's "spotty work history," nor his repeated failure to follow through on prescribed treatment bolsters his credibility. (Id. at 8-9.) Claimant's "spotty work history . . . does not tend to bolster his credibility." (Id.) Regarding the ALJ's hypothetical questions, the Commissioner maintains that Claimant's

7

subjective allegations "may find expression in the residual functional capacity finding, but they should never themselves be included in a hypothetical question to a vocational expert." (Id. at 9-10.)

1. Residual Functional Capacity Assessment.

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity (RFC) for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a); 416.945(a) (2006). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2)(2006).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

Although medical source opinions are considered in evaluating an individual's residual functional capacity, the final responsibility for determining a claimant's RFC is reserved to the Commissioner. See 20 C.F.R. § 404.1527(e)(2) (2006). In determining disability, the ALJ must

8

consider the medical source opinions "together with the rest of the relevant evidence we receive." Id. § 404.1527(b).

   A. *Opinion Evidence.*

The ALJ determined that Claimant had the RFC to perform light work with additional limitations, which included restrictions on activity with the left arm, as well as postural and environmental limitations. (Tr. at 23.) In determining Claimant's RFC, the ALJ gave controlling weight to the form Hepatitis C Residual Functional Capacity Questionnaire completed by his treating physician, Dr. Kamalesh Patel, M.D., on January 31, 2006. (Tr. at 24.) The ALJ noted that Dr. Patel simply listed Claimant's reported symptoms and side effects from his medications, but declined to specify any functional work limitations that Claimant would have. (Id.) The ALJ gave greater weight to the opinions of the two reviewing state agency medical consultants, though the ALJ found the opinion of Dr. Lambrechts more consistent with the overall record than the opinion of Dr. Reddy. (Tr. at 24.) The ALJ noted that the two opinions differed as to the limitation of Claimant's left upper extremity, and the ALJ determined that exertionally limiting Claimant to light work would accommodate his symptoms, including pain and fatigue. (Id.)

On the form Hepatitis C RFC Questionnaire, Dr. Patel diagnosed Claimant as suffering from hepatitis C, fatigue, nausea, and vomiting. (Tr. at 24, 214.) Dr. Patel identified Claimant's symptoms and signs to include: chronic fatigue, weakness, sleep disturbance, hot/cold spells, dizzy spells, nausea/vomiting, muscle and joint aches, loss of appetite, weight loss, and abdominal pain. (Id.) He reported that it was unknown whether the degree of fatigue correlated with the severity of hepatitis C or with the degree of elevation of laboratory tests. (Id.) Dr. Patel further reported that Claimant experienced nausea, fatigue, and vomiting, as side effects of his treatment. (Tr. at 24, 215.) Regarding any functional limitations resulting from Claimant's impairments, Dr. Patel reported that he was

9

"unsure" and did not identify any specific functional limitations. (Tr. at 23, 25, 215-17.)

On May 23, 2005, reviewing state agency medical consultant, Dr. Marcel G. Lambrechts, M.D., completed a form physical RFC assessment on which he opined that Claimant's primary diagnosis was neck and left shoulder pain and that his secondary diagnosis was chronic hepatitis B and C. (Tr. at 25, 173-79.) Dr. Lambrechts opined that Claimant was capable of performing work at the light exertional level with occasional limitations of climbing, balancing, and crawling. (Tr. at 25, 175.) He further opined that Claimant's ability to perform gross manipulation was limited due to pain, a slight decrease in strength, mild atrophy, tenderness, and crepitations in his left shoulder. (Tr. at 25, 176.) Dr. Lambrechts also opined that Claimant should avoid concentrated exposure to temperature extremes, vibration, and hazards. (Tr. at 25, 177.)

On November 9, 2005, another reviewing state agency medical consultant, Uma Reddy, M.D., opined that Claimant was capable of performing work at the medium level of exertion with frequent limitations in climbing ramps and stairs and occasional limitations in climbing ladders/rope/scaffolds, balancing, stooping, kneeling, crouching, and crawling. (Tr. at 25, 183.) Dr. Reddy opined that Claimant was limited in reaching all directions, including overhead, due to her neck and shoulder impairments, and should avoid concentrated exposure to vibration and hazards. (Tr. at 25, 184-85.) Despite initially having found Claimant capable of performing medium exertional level work, Dr. Reddy later noted that Claimant's activities of daily living were disproportionately limited, but that he could "still be able to do light work." (Tr. at 186.)

Based on the foregoing, it appears that Dr. Patel did not render an actual opinion regarding Claimant's RFC. Rather, he only identified Claimant's signs and symptoms and side effects from treatment. In acknowledging Claimant's treatment with Dr. Patel, the ALJ noted that Dr. Patel was

the physician treating Claimant's hepatitis B and C from June, 2005, through June, 2006.[3] (Tr. at 22-24.) Despite Dr. Patel's treating relationship with Claimant, the fact remains that he did not offer an opinion as to Claimant's RFC. The ALJ however, acknowledged Dr. Patel's identification of Claimant's signs and symptoms. The state agency medical consultants offered the only opinions of record regarding Claimant's RFC. Accordingly, the Court finds that the ALJ properly evaluated the opinion evidence of record and his decision in according little weight to the "opinion" of Dr. Patel is supported by substantial evidence.

### B. *Pain and Credibility*.

A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain or symptoms alleged. 20 C.F.R. §§ 404.1529(b)

---

[3] In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." *Ward v. Chater*, 924 F. Supp. 53, 55 (W.D. Va. 1996); *see also*, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." *Id.* §§ 404.1527(d)(2), 416.927(d)(2)(2006).

11

and 416.929(b) (2006); SSR 96-7p; See also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). If such an impairment is established, then the intensity and persistence of the pain or symptoms and the extent to which they affect a claimant's ability to work must be evaluated. Id. at 595. When a claimant proves the existence of a medical condition that could cause the alleged pain or symptoms, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative. Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (2006). Additionally, the Regulations provide that:

[w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons. . . . Factors relevant to your symptoms, such as pain, which we will consider include:

      (i) Your daily activities;

      (ii) The location, duration, frequency, and intensity of your pain or other symptoms.

      (iii) Precipitating and aggravating factors;

      (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

      (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

      (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and

>   (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2006).

>   SSR 96-7p repeats the two-step regulatory provisions:
>
>   First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.
>
>   Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" in assessing the credibility of an individual's statements. Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other evidence in determining whether the claimant's impairment is "severe" within the meaning of the Regulations. A "severe" impairment is one which significantly limits the physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

>   Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence

13

of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig, 76 F.3d at 585, 594; SSR 96-7p ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. Id. at 595. Nevertheless, Craig does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical evidence.

The ALJ noted the requirements of the applicable law and Regulations with regard to assessing pain, symptoms and credibility. (Tr. at 23.) The ALJ found, at the first step of the analysis, that Claimant's "medically determinable impairments could reasonably be expected to produce the alleged symptoms." (Tr. at 24.) Thus, the ALJ made an adequate threshold finding and proceeded to consider the intensity and persistence of Claimant's alleged symptoms and the extent to which they affected Claimant's ability to work. (Tr. at 23-24.) At the second step of the analysis, the ALJ concluded that Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. at 24.)

The Court finds that the ALJ properly considered the factors under 20 C.F.R. § 404.1529(c)(4) and 416.929(c)(4), in evaluating Claimant's pain and credibility, despite Claimant's assertion to the contrary. The ALJ summarized Claimant's testimony in his decision, and acknowledged Claimant's reports of pain and weakness in his upper extremity, weakness, fatigue,

and extreme thirst. (Tr. at 20, 249-50, 256-60, 264-65, 269-70.) The ALJ noted Claimant's testimony that he felt fatigued four days out of the week and stayed in bed most of those days. (Tr. at 20, 276-77.) The ALJ further noted that Claimant experienced muscle spasms in his lower extremities. (Tr. at 20, 274-75.) The ALJ thus noted the nature and location of Claimant's pain, and further noted the testimony that he had a history of alcohol and drug dependence. (Tr. at 20-21, 252-54.) Regarding treatment, the ALJ noted that Claimant underwent a series of Interferon for his hepatitis, that he took prescribed medications for his diabetic condition, and that he had not been placed on any restrictions by any of his physicians. (Tr. at 20-21, 258-60, 267-68, 279.)

The ALJ also summarized the medical evidence of record which indicated that Claimant complained to Dr. Faisal Bukeirat, M.D., of fatigue and pain in the upper right quadrant of his abdomen. (Tr. at 21, 150.) In January and February, 2005, the ALJ noted Dr. Bukeirat's opinion that Claimant's stomach pain was related to irritable bowel syndrome due to the recent stress of losing his job. (Tr. at 21, 143-45.) In May, 2005, Dr. Patel reported that Claimant was doing fine with no complaints, and Claimant failed to appear for an appointment scheduled in January, 2006. (Tr. at 21.) The medical evidence reveals that on September 23, 2004, Claimant reported to Dr. Bukeirat that he was fatigued, had vague pain in the right upper quadrant rated at a two out of ten, and that he did not feel well. (Tr. at 150.) Dr. Bukeirat noted that at that time, Claimant denied dizziness, pain, joint pain or stiffness, muscle pain, cramping or swelling, lightheadedness, weakness, temperature intolerance, or increased sweating or thirst. (Id.)

The ALJ also summarized the treatment notes from Dr. Patel, beginning in June, 2005. (Tr. at 22, 189-212, 213-18, 226-29.) In June, the ALJ noted that Claimant complained of upper quadrant pain, occasional constipation, nausea, heartburn with certain foods, and diarrhea. (Tr. at 22, 201.) Dr. Patel noted that Claimant had no recent history of significant weight loss or gain, temperature

intolerance, muscle aches or pains, cramps, or joint stiffness.[4] (Tr. at 22, 202.) On July 21, 2005, Claimant complained of swelling in both legs, midline abdominal pain and cramping, nausea with sweating and shaking, seeing spots for up to one hour, heartburn with certain foods, constipation, a fair appetite, and no diarrhea. (Tr. at 22, 197.) Dr. Patel again reported no recent history of the symptoms as reported above. (Tr. at 22, 197-98.) In September, 2005, Claimant reported that he had not taken the Interferon treatment because he could not afford the medication. (Tr. at 193.) At that time he reported that he did not feel well, was tired all the time, felt like he would pass out in the heat, and had alternating constipation and diarrhea. (Tr. at 22, 193.) The ALJ noted that Claimant had started the Interferon by December 27, 2005, but that he vomited the medications. (Tr. at 22, 189.) The ALJ further noted that he was fatigued and weak, and the evidence indicates that he also reported muscle cramps and joint swelling, as well as extreme thirst. (Tr. at 22, 189-90.) Finally, the ALJ noted that on June 7, 2006, Dr. Patel indicated that treatment had ended because Claimant missed two appointments. (Tr. at 22, 226.) Claimant complained of decreased energy that had progressively worsened over the last few months, a decreased appetite, and abdominal tenderness. (Tr. at 22-23, 226-28.) Dr. Patel's progress notes indicate that Claimant further complained of weakness, chills, night sweats, fainting, nausea, vomiting, heartburn, indigestion, irregular bowels, muscle weakness, cramps, joint swelling, and extreme thirst. (Tr. at 227.)

The ALJ also acknowledged Claimant's reported activities of daily living. (Tr. at 21, 24.) Claimant testified that he watched television, listened to the radio, cared for his personal needs, performed household chores, washed dishes, mowed the lawn, and shopped for groceries. (Tr. at 21,

---

[4] A separate form containing a review of symptoms on June 10, 2005, however, reveals night sweats, fainting, abdominal pain, nausea, vomiting, poor appetite, heartburn, indigestion, abdominal bloating, irregular bowels, diarrhea, muscular pain, weight loss and gain, heat intolerance, extreme thirst, and low blood sugar. (Tr. at 206.) The same symptoms were reported on July 21, 2005. (Tr. at 204.)

279-82.) He further testified that he operated a motor vehicle and intended to renew his CDL. (Tr. at 21, 24, 278-79.) On a form Function Report - Adult, dated March 24, 2005, Claimant reported that he made his bed, showered, watched his mother's dog, took out the trash, and watched television on a daily basis. (Tr. at 21, 82.) He reported that he prepared simple meals, cleaned his room, drove a vehicle, shopped for food and clothes once or twice a month, watched racing and television, paid his bills, was able to count change, and handled or used a checking and savings account. (Tr. at 21, 83-87.) Claimant also indicated that he followed written instructions "really good." (Tr. at 21, 87.)

On a further form Function Report - Adult, dated August 13, 2005, Claimant additionally reported that he fed birds and his fish, cleaned the fish bowl, checked on his mother's flowers, walked to the mail box, cared for his personal needs but had trouble putting on his socks and shoes, rode in a car, shopped for food and clothes once a week, watched television, read books, and talked on the phone once or twice a day. (Tr. at 21, 102-06.) Claimant reported however, that he was no longer able to control money or follow written instructions because his memory was not very good and he experienced dizzy spells. (Tr. at 105, 107.) Finally, on a form Questionnaire from the Agency, dated February 22, 2006, Claimant reported that he cooked frozen dinners, occasionally washed dishes and mopped or vacuumed the floors, and that he shopped for groceries but that he would forget items. (Tr. at 127.)

As demonstrated above, contrary to Claimant's allegations, the ALJ did not disregard Claimant's nonexertional limitations. Regarding Claimant's hot and cold spells and temperature intolerance, the ALJ limited him from concentrated exposure to extreme heat and cold. (Tr. at 23.) The ALJ found that Claimant's reported activities of daily living were inconsistent with Claimant's reported pain, fatigue, and discomfort that he testified required him to stay in bed most of the day. (Tr. at 24.) Claimant takes issue with the ALJ's noting these inconsistencies because he asserts that

his activities were not performed continuously and that he had to stop performing his activities frequently due to dizzy spells, vomiting, and other symptoms. The evidence of record however, reveals varying reports regarding Claimant's activities all the while he asserts that he reported similar symptoms and signs. The Court finds that the ALJ properly weighed the inconsistencies in the record and determined that Claimant was not entirely credible.

      The ALJ further found that Claimant's reports of fatigue, passing out spells, and side effects from his medications were downplayed by his continued operation of a motor vehicle without a handicap tag and his intention of renewing his CDL next month so that he could continue to drive commercial trucks. (Tr. at 24.) As the Commissioner points out, Claimant testified that he felt that he would likely kill himself and others if he drove a vehicle. (Tr. at 277.) This statement is inconsistent with those statements reported on forms submitted with his applications and with his testimony that he intended to renew his CDL. Most importantly however, this statement is inconsistent with Claimant's testimony that he drove himself to the administrative hearing at a distance of approximately thirteen miles and that he continued to drive short distances. (Tr. at 278-79.) Finally, the ALJ noted that Claimant failed to take his prescribed medications because he experienced vomiting spells, had a tendency to miss appointments, and that none of his physicians placed on him any physical restrictions, except for repeated warnings to abstain from any use of drugs or alcohol. (Tr. at 24.) In view of the foregoing, it was reasonable for the ALJ to discount Claimant's testimony that due to his vomiting and other symptoms, he spent the better part of four days a week in bed. As the ALJ noted, the evidence indicated that much of Claimant's signs and symptoms appeared to result as a treatment side effect, which should subside on completion of treatment. Furthermore, the inconsistencies in Claimant's testimony do not lend support to his credibility. Additionally, neither Claimant's treating physician nor the state agency medical

consultants assessed any functional limitations from Claimant's vomiting.

Claimant also reported loss of appetite, sleep disturbance, and weight loss, though the evidence does not demonstrate any functional limitations resulting from these symptoms, signs, or side effects. To the extent that the ALJ did not address them specifically in his RFC assessment, the Court finds that any such error is harmless. Based on the foregoing, the Court finds that the ALJ's RFC determination and assessment is supported by substantial evidence of record.

2. Hypothetical Questions.

Claimant further alleges that the ALJ erred in not including Claimant's subjective signs and symptoms in the hypothetical questions presented to the VE. (Document No. 12 at 4-5 and 10-11.) The Commissioner asserts that pursuant to 20 C.F.R. § 416.920(g)(1), only age, education, past relevant work experience, and residual functional capacity may be considered at step five of the sequential analysis. (Document No. 13 at 10.) "Therefore, it would be erroneous as a matter of law to include subjective allegations into a hypothetical question. Such allegations, if credible, may find expression in the residual functional capacity finding, but they should never themselves be included in a hypothetical question to a vocational expert." (Id.)

To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments. Walker v. Bowen, 889 F.2d 47, 51 (4th Cir. 1989). "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities – presumably, he must study the evidence of record to reach the necessary level of familiarity." Id. at 51. Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record. See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).

Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe. See Benenate v. Schweiker, 719 F.2d 291, 292 (8th Cir. 1983).

It is clear that the ALJ specifically did not ask the VE to consider an individual with the signs and symptoms identified in Claimant's brief, namely, chronic fatigue, dizzy spells, nausea/vomiting, muscle and joint aches, abdominal pain, weakness, hot and cold spells, loss of appetite, sleep disturbance, and weight loss. As discussed above however, the ALJ properly discounted these symptoms and signs in assessing Claimant's RFC. Accordingly, the Court finds that the ALJ was not required to include these symptoms and signs in the hypothetical questions presented to the VE, and that Claimant's argument on this issue is without merit.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Document No. 11.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Document No. 13.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: September 18, 2008.

R. Clarke VanDervort
United States Magistrate Judge